IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

KIMBERLY RASLEY,[1]
      Petitioner,

vs.                          Case No. 5:08cv368/RH/EMT

EDWIN G. BUSS,[2]
      Respondent.
_____/

## ORDER and REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (Doc. 1). Respondent filed an answer and relevant portions of the state court record (Doc. 34). Petitioner filed a reply (Doc. 38).

The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b). After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are undisputed and established by the state court record (*see* Docs. 21, 34, Exhibits).[3] Petitioner was indicted in the Circuit Court

---

[1] Petitioner spells her surname "Rasley" and "Rasely" in her petition (*see* Doc. 1 at 24). Both spellings appear in the state court record.

[2] Edwin G. Buss succeeded Walter A. McNeil as Secretary for the Department of Corrections, and is automatically substituted as Respondent. *See* Fed. R. Civ. P. 25(d)(1).

[3] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's motion to dismiss (Doc. 21) and answer (Doc. 34).

for Bay County, Florida, on one count of second degree murder with a firearm (Ex. A).  Following a jury trial, Petitioner was convicted as charged (Exs. B, C).  Petitioner was adjudicated guilty and sentenced on September 23, 2002, to forty (40) years of imprisonment with a 25-year mandatory minimum (for use of a firearm) and with pre-sentence jail credit of eighty-two (82) days (Ex. D).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA").  While the appeal was pending, Petitioner filed a motion to correct sentencing error, pursuant to Rule 3.800(b)(2) of the Florida Rules of Criminal Procedure (Ex. AA).  The state circuit court denied the motion (Ex. BB).  The First DCA affirmed the judgment of conviction and sentence per curiam on July 30, 2004 (Ex. H).  Rasley v. State, 878 So. 2d 473 (Fla. 1st DCA 2004).

On July 21, 2005, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. J).  On July 20, 2006, the state circuit court summarily denied some of Petitioner's claims and set an evidentiary hearing on other claims (Exs. N, Q).  Petitioner was represented by counsel at the evidentiary hearing (*see* Ex. Q).  The circuit court subsequently denied the remaining claims (Ex. R).  Petitioner, through counsel, appealed the circuit court's decision to the First DCA, raising three issues (Ex. S).  The appellate court affirmed per curiam without written opinion on July 14, 2008, with the mandate issuing July 30, 2008 (Exs. V, W).  Rasely v. State, 985 So. 2d 1097 (Fla. 1st DCA 2008) (Table).  Petitioner filed a motion for rehearing, but the appellate court denied the motion (Exs. X, Y).

Petitioner filed the instant habeas action on December 12, 2008 (Doc. 1).  The court previously determined that the petition is timely (*see* Docs. 25, 31).

II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19.  In relevant part, section 2254(d) now provides:

(d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[4]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Id.</u>, 529 U.S. at 412–13 (O'Connor, J., concurring); <u>Ramdass v. Angelone</u>, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on

---

[4] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." Neeley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it. Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether

its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion." Williams, 529 U.S. at 410–12.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see, e.g. Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. See Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that

he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

## III. EXHAUSTION AND DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[5] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)). To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. Duncan, 513 U.S. at 365–66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277–78.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement. In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief. 404 U.S. at 277. In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," id., 404 U.S. at 278, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state

---

[5]Section 2254 provides, in pertinent part:

(b)(1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
      (A)  the applicant has exhausted the remedies available in the courts of the State; or
      (B) (i)  there is an absence of available State corrective process; or
         (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

court. In <u>Anderson v. Harless</u>, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt. *Id.* 459 U.S. at 7 (citing <u>Sandstrom v. Montana</u>, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)). The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." <u>Anderson</u>, 459 U.S. at 7 (internal quotation marks omitted). The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the <u>cited</u> case advanced a federal claim. *Id.*, 459 U.S. at 7 and n.3. Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought. *Id.*

Years later, the Supreme Court readdressed the "fair presentation" requirement in <u>Duncan v. Henry</u>, 513 U.S. 364. The <u>Duncan</u> Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[6] The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." <u>Duncan</u>, 513 U.S. at 365–66. Recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." <u>Baldwin v. Reese</u>, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004). The <u>Baldwin</u> Court commented that "[a] litigant wishing to raise a federal issue can easily indicate

---

[6] The petitioner in <u>Duncan</u> raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal. Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Id.*, 541 U.S. at 32. With regard to this statement, the Eleventh Circuit stated in <u>McNair v. Campbell</u>, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion. However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'" <u>McNair</u> [<u>v. Campbell</u>], 315 F. Supp. 2d at 1184 (quoting <u>Vasquez v. Hillery</u>, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)). This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302-03 (citations omitted).[7]

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally barred from federal review. <u>Bailey v. Nagle</u>, 172 F.3d 1299, 1302–03 (11th Cir. 1999). This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. *See* <u>Coleman v. Thompson</u>, 501 U.S. 722, 734–35 and n.1, 111 S. Ct. 2546, 2555 and n.1, 115 L. Ed. 2d 640 (1991); <u>Caniff v. Moore</u>, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); <u>Chambers v. Thompson</u>, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* <u>Tower v. Phillips</u>, 7 F.3d 206,

---

[7] In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." <u>McNair v. Campbell</u>, 416 F.3d 1291, 1303 (11th Cir. 2005). The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. *Id.*

210 (11th Cir. 1993); <u>Parker v. Dugger</u>, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991). In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. <u>Bailey</u>, 172 F.3d at 1303. In the second instance, a federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar. *Id.*. A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question. *See* <u>Harris v. Reed</u>, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989). The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question. <u>Lee v. Kemna</u>, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002). The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision. <u>Judd v. Haley</u>, 250 F.3d 1308, 1313 (11th Cir. 2001). First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[8] Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. Third, the state procedural rule must be adequate. *Id.* The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion. *Id.*

To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim. <u>Tower</u>, 7 F.3d at 210; <u>Parker</u>, 876 F.2d 1470. "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." <u>McCleskey v. Zant</u>, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)). Lack of counsel or ignorance of available procedures is not enough to establish cause. <u>Tower</u>, 7 F.3d at 210. To satisfy the miscarriage of justice exception,

---

[8] The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits. <u>Marek v. Singletary</u>, 62 F.3d 1295, 1302 (11th Cir. 1995); <u>Alderman v. Zant</u>, 22 F.3d 1541 (11th Cir. 1994).

the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." Schlup, 513 U.S. at 327. Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

*Id.*

Within this framework, the court will review Petitioner's claims.

IV.   TRIAL EVIDENCE

Review of the evidence adduced at Petitioner's trial provides helpful context for her claims. Vicki Hogan, a Bay County 911 dispatcher, testified that on November 3, 2001, she received a call from Petitioner stating that her husband had been shot (Ex. B at 23–24). Hogan identified the tape recording of the call, and it was published to the jury (*id.* at 24–27). During the 911 call, Petitioner told Ms. Hogan she shot her husband in the head "coming in," and she thought he was going to beat her up again (*id.* at 25–27, 29). Ms. Hogan testified that when she saw Petitioner at the Sheriff's Office later that evening, Petitioner did not appear to be limping and had no visible physical injuries (*id.* at 28).

Deputy Ed Hagan, who first responded to the Rasely house less than one minute after receiving a dispatch about the shooting, testified that he observed a man lying face down with part of his body "in the door" and the other part "out of the door" (*id.* at 31–33). Hagan testified he heard a woman (Petitioner) screaming, "Somebody please help me, somebody please help me," so he ran to the front of the house (*id.* at 33). Hagan testified he did not notice any physical injuries on Petitioner, so he went into the house to determine if the man had a pulse (*id.* at 33, 35). He stated he noticed that the man had keys in his left hand (*id.* at 33).

Angie Marshall, a crime scene investigator, testified she collected evidence and photographed the Rasely house (*id.* at 40–42). She identified several photographs, and they were entered into evidence (*id.* at 43–59). Investigator Marshall testified as to what was represented in the

photographs, including a drink spilled on the floor in front of the refrigerator, a phone book opened to a section that listed phone numbers primarily for private investigators and printing companies, two empty suitcases located next to the couch, the top of a can of air freshener, and numerous pictures of the victim and the bullet removed from his head (*id.* at 59). Investigator Marshall testified that the frame of the door to the master bedroom was cracked, but the door functioned properly and did not appear to be loose on its hinges (*id.* at 48). Investigator Marshall did not recall seeing any splintering or marks on the floor around the door frame (*id.* at 66). She testified she noticed a defect in the upper right-hand corner of the door, but she did not know what caused it (*id.* at 79). She admitted she did not examine the locking mechanisms on the door to see whether or not they worked, nor did she closely examine the door jamb at the spot where the locking mechanism fit (*id.*). She testified she observed items on a hope chest and night stand in the master bedroom, and she did not observe anything thrown around off the chest or night stand (*id.* at 49, 87). The only item she found broken in the bedroom was a ceramic fish in front of the master bedroom closet (*id.* at 49, 52). Investigator Marshall testified there were no other indications of a struggle or fight in the bedroom (*id.* at 87). She testified there were no tears or stretch marks on the fabric of the tank top worn by Petitioner (*id.* at 63).

Kathy Boker, the Bay County Sheriff victim's advocate who reported to the scene, testified she took photographs of Petitioner and observed no visible injuries (*id.* at 89–91). She observed an area on Petitioner's back that seemed to be imprinted with the pattern of the sweater she was wearing (*id.* at 91–93).

Investigator Tony Bruening testified he took a statement from Petitioner on the day of the shooting (*id.* at 102–03). He identified an audiotape as the recording of his interview with Petitioner, and the tape was published to the jury (*id.* at 102–03, 124–48). On the tape, Petitioner stated that a couple of days before the shooting, she intercepted a piece of mail from her husband's girlfriend, and this was the "last straw" (*id.*). She also related that the girlfriend had called the house, and Petitioner had attempted to trace the call (*id.*). Petitioner stated that on the night of the shooting, she had taken down suitcases from the attic and told her husband that she and the children were going to leave (*id.*). Petitioner stated her husband grabbed the key and left the house through the side door

(*id.*). She stated she believed she ran to the door and locked it, but she was not sure, and when she heard him coming back in, she "freaked out" (*id.*). Petitioner stated she ran down the hall and grabbed a gun (*id.*). She stated she "got scared" and said, "Please, Randy, don't come in . . . please don't" and then "everybody started screaming." (*id.*). She stated as soon as her husband opened the door, he looked at her and "came right at" her (*id.*). Petitioner stated the gun was in her hand, and she was standing in the doorway between the kitchen and laundry room (*id.*). She stated she was shaking and telling her husband, "don't, I swear I'll shot you. We don't need this." (*id.*). Petitioner stated her husband said, "F— you" and began "coming at" her, so she pulled up the gun (*id.*). Petitioner explained that she had never shot the gun before that night, and she thought a safety latch was on when she picked it up to scare him (*id.*). She stated she would probably have been beaten to death if she had not shot him (*id.*). Petitioner stated she accidentally shot her husband and intended only to scare him (*id.*).

Investigator Bruening testified he did not observe any marks, bruises or any indicators that Petitioner had suffered any injury, nor did Petitioner relate to him that she had suffered any injury (*id.* at 156–57). On cross-examination, defense counsel asked if there was a reason he and the other officer interviewing Petitioner interrupted her each time she started to tell them things that indicated she was acting in self defense, and Bruening responded, "I guess not." (*id.* at 149). He admitted that other officers had taken statements from Petitioner and the four children present that night, and the officers reported the contents of the statements to him, including that the children heard "thumping and the sound of a body being thrown against a wall in the bedroom" (*id.* at 151–52). Investigator Bruening admitted he did not instruct the crime scene investigators to examine the bedroom door (*id.* at 152–53). He admitted that Petitioner told him her husband had pushed her around the room that night, that she had received a black eye on another occasion, and that she related other acts of violence by the victim (*id.* at 157). Bruening also admitted that during his deposition he stated, "It's not self-defense because she was not all bloody . . . ." (*id.* at 155–56).

Whitney Allen, a friend of Petitioner's daughter Kristen Carlo, testified that she spent the night at Petitioner's house the night of the shooting (*id.* at 158–59). She testified Kristen told her that Petitioner said Mr. Rasely was cheating on her (*id.* at 158–61). Whitney testified she saw and

heard Petitioner and Mr. Rasely sitting at a table talking as if they were unhappy with each other (*id.* at 163). She testified the Raselys went to their bedroom, and she heard "hits against a wall or door or something" (*id.* at 164–65). She testified she saw Petitioner spray what looked to be Lysol in Mr. Rasely's face when they left the bedroom (*id.* at 166). Petitioner told Mr. Rasely to "get out," and Mr. Rasely responded, "I'm going, I'm going." (*id.* at 168–69). Whitney testified she never saw Mr. Rasely act like he was going to strike any of the children or Petitioner, nor did she see him kick at one of the boys (*id.* at 168–69, 176). Whitney testified Mr. Rasely went out the door on the side of the kitchen (*id.* at 170–71). She stated she thought Petitioner locked the door, because she heard someone lock a door (*id.*). Petitioner walked back to her bedroom "kind of fast" and seemed upset (*id.* at 172). Whitney testified Petitioner was not in the bedroom "even a minute," when she came out with a gun in her left hand (*id.* at 173, 181). The prosecutor asked Whitney if the children were saying anything to Petitioner at that time, and Whitney stated she thought Kristen's brothers were saying, "Mom, don't do anything, don't do it." (*id.* at 173–74). Whitney testified she and Kristen ran into the bathroom and locked the door (*id.* at 174–75). She stated she did not know where the boys were, and she could not hear anything because she plugged her ears (*id.*). She testified she and Kristen left the bathroom at some point and went to Kristen's room (*id.*). She testified they got under the covers of Kristen's bed, and she (Whitney) covered her ears again (*id.*). Whitney testified Kristen went back and forth crying and screaming at her mom, "Don't do it, don't do it." (*id.* at 175). On cross-examination, Whitney admitted she told police that the Raselys had started throwing things at each other; that Petitioner locked the door behind Mr. Rasely as he went out; and that right after Petitioner locked the door, Mr. Rasely tried to get back in, and Petitioner got the gun at that point (*id.* at 179–80). Whitney also admitted she could not hear things because there was screaming, and she heard Petitioner tell the 911 operator that she shot Mr. Rasely only because she thought he was going to hit her again (*id.*).

Kristen Carlo, Petitioner's daughter, testified that on the night of the shooting, she and Whitney Allen arrived at the house and saw suitcases (*id.* at 200). Petitioner was sitting in a chair waiting for Mr. Rasely to get home (*id.* at 200–01). The prosecutor asked Kristen whether she knew why Petitioner had gotten the suitcases out, and Kristen responded, "Because she found out that he

— well, I think he was cheating on her and she got mad so she got out the suitcases and we were going to pack and move back to Jacksonville." (*id.*). Kristen testified Petitioner had discovered Mr. Rasely was cheating on her because she had called him earlier and heard women in the background watching a football game (*id.*). Kristen testified that when Mr. Rasely arrived home, Petitioner told Kristen to take her brothers and go to a bedroom (*id.* at 202–03). Petitioner and Mr. Rasely stayed in the dining area for thirty (30) minutes to an hour and talked, and Petitioner told him she was going to pack her and the kids' things (*id.* at 202–03). Kristen testified that she, Whitney Allen, and the boys came back into the room and began watching television, and Petitioner went into the bedroom and called Mr. Rasely into the bedroom (*id.* at 204). Mr. Rasely walked into the bedroom and shut and locked the door (*id.*). Kristen testified she heard them yelling, and she heard a bang against the door like somebody was pushing somebody against the door (*id.* at 205). She testified she heard it again and heard Petitioner say, "get off of me" (*id.*). She heard the sound again, and she (Kristen) started crying (*id.*). She walked up to the door and heard Mr. Rasely say, "Why do you want to move back to Jacksonville?" (*id.*). Kristen testified she walked into the other room and then "heard Mama jiggling the door like, help me Kristen, help me." (*id.*). Kristen testified she walked up to the door and saw that Mr. Rasely "had it to where the top was pushed in and the bottom was pushed out so [Petitioner] couldn't get out" (*id.*). She testified that when Mr. Rasely opened the door, Petitioner was on his back, and he pushed her off (*id.*). She testified Petitioner threw him the keys as he was walking out, and Petitioner started spraying him with Lysol so he could not hit her (*id.* at 206). Mr. Rasely threw a t-shirt at Petitioner, and she threw an empty can at him (*id.*). Mr. Rasely threw the can back at Petitioner, and she threw a cup of tea at him (*id.*). Kristen testified that when Mr. Rasely walked out of the bedroom, she (Kristen) said, "Don't you be slamming my mama up against the door like that," and Mr. Rasely told her, "F— off" and told everyone to "F— off" (*id.* at 206–07). Kristen testified that when Mr. Rasely told her to "F— off," she responded, "Why don't you." (*id.*). She testified Mr. Rasely then raised his hand at her, and Petitioner got in front of him so that he could not hit her (Kristen) (*id.* at 207). Kristen testified she did not see Mr. Rasely hit Petitioner or the boys (*id.* at 207). She testified that when Mr. Rasely walked out through the laundry room door, Petitioner locked the door behind him (*id.* at 207–08). Approximately thirty (30) seconds to one

minute later, Kristen heard the key unlocking the door, and she said "He's coming back, Mama, he's coming back." (*id.* at 208). Petitioner then went to the back bedroom and brought out the gun (*id.* at 208). Kristen testified she and her brothers started screaming "Don't do it!" and they were all crying (*id.* at 210). She testified that as Petitioner was walking into the kitchen, the door was already open, and Mr. Rasely was standing in the doorway (*id.* at 210–11). Kristen testified Mr. Rasely began cursing at Petitioner (*id.* at 211). She testified Petitioner's hand was shaking, and she said "Get out of my house." (*id.*). Kristen testified Mr. Rasely appeared to be moving toward Petitioner (*id.*). She testified that the gun went off, and Mr. Rasely fell to his knees and onto the floor (*id.* at 212). Kristen testified Petitioner then started screaming his name and was crying (*id.* at 208). Petitioner yelled, "Give me the phone! Give me the phone!" (*id.* at 208). Kristen testified Mr. Rasely had shown Petitioner how to use the gun (*id.* at 209, 215). On cross-examination, she testified she thought Petitioner was upset about Mr. Rasely cheating on her because she trusted him, but she (Kristen) did not think Petitioner was angry (*id.* at 221).

Nine-year-old Ryan Rasely testified he did not hear his parents talking loudly when they were in the kitchen area and he was in the bedroom (*id.* at 224–25). He testified that while his parents were in the bedroom he heard "two bumps, two bumps on the door, loud." (*id.*). He went to the bedroom door and saw "the door was behind the door frame" (*id.* at 226). He stated his mom was trying to get out, but "she couldn't pull it" (*id.*). He testified that when his parents came out of the bedroom, his mom was behind his dad, and his dad pushed her back (*id.*). He stated his dad ran out of the bedroom, and his mom walked out fast right behind him (*id.* at 228–29). He testified his mom sprayed his dad with air freshener and said, "Please get out. Please get out." (*id.* at 229). She then threw the can of air freshener at his dad, and his dad sprayed it at her and threw it at her (*id.*). Ryan testified his dad then threw some books at his mom's feet (*id.*). He stated his parents had a fight and were hitting each other before his mom threw the can (*id.* at 231). He stated after they stopped fighting, his dad went out the door, and his mom locked it (*id.*). He testified his dad kicked at him on his way out the door (*id.* at 237). Ryan testified his mom went and got the gun, and when she came back, she locked the door again (*id.* at 231–32). Ryan testified his dad said, "Let me in. Let me in." (*id.* at 232). His mom responded, "Randy, please go away. Randy, please go away." (*id.*).

Ryan testified when his dad opened the door, he took one step in; then Ryan turned around, and his dad got shot (*id.* at 232). He stated the gun went off at almost the same time the door opened (*id.* at 235). He stated his mom was only two feet from his dad when she shot him (*id.* at 233). Ryan stated his mom said, "Randy, Randy, please wake up. I will never do this again." (*id.* at 234). Ryan testified he told his mom not to shoot his dad (*id.* at 235–36).

Dr. Marie Hansen, the medical examiner who performed the autopsy on Mr. Rasely, testified Mr. Rasely was found dead lying over the stoop or the threshold of the door into the house (*id.* at 245–46). The bullet penetrated his mouth and lodged in the back of his skull into the brain stem, instantaneously incapacitating him (*id.* at 248–49). The placement of his body was consistent with his having one foot flat and one in the air in forward movement at the time of the shooting (*id.* at 262). Dr. Hansen testified that although it was clear Mr. Rasely was going in a forward direction, there was nothing to indicate his rate of motion (*id.*). She testified the firearm was fired at least 24–42 inches away from the victim (*id.*). She testified that the path and trajectory of the gunshot wound to Mr. Rasely was "entirely consistent" with a man advancing on a woman into the residence (*id.* at 259). When asked on cross-examination whether she could rule out that Mr. Rasely had been shot in self-defense, she responded, ". . . I can't tell the emotions or the motivations behind an injury, from the injury." (*id.* at 264).

Donald Rawls, forensic firearms examiner, testified that the gun fired by Petitioner was a .357 Magnum caliber Colt revolver (*id.* at 264–68). He testified that in single action mode (where the hammer is cocked and stays back), the amount of pull required to draw the trigger would be four (4) pounds (*id.* at 269–70). He stated that in double action mode (where the hammer is not cocked and the user must cock it by squeezing the trigger), the amount of pull required to draw the trigger would be 11.5 pounds (*id.*). Mr. Rawls testified he was able to determine that Mr. Rasely was at a distance greater than 4 to 6 feet from the gun when it was fired (*id.* at 271).

The defense presented testimony from Dr. Douglas Stringer. Dr. Stringer testified he was a physician specializing in neurosurgery (*id.* at 184). He testified he examined Petitioner's right arm and hand and reviewed the report of another doctor "as to a finding of right hand, right arm numbness" and also reviewed x-rays of Petitioner's scoliosis (*id.* at 186). He testified Petitioner had

"a significant curve" in her spine (*id.*). As to Petitioner's right hand, he testified she suffered from carpel tunnel syndrome, which was the impairment of the nerve that extended from her neck down her arm through her forearm into her hand, and it "goes from the index, middle finger, right hand" (*id.* at 187–88). He testified Petitioner's carpal tunnel syndrome affected her thumb, index finger, and middle finger (*id.*). He stated it affects the "trigger finger" in that it affects the ability to know how much pressure is being pulled on a trigger (*id.*). As to Petitioner's scoliosis, Dr. Stringer testified she had poor muscle development because the scoliosis had weakened her back and chest muscles, and she was more frail and susceptible to injury due to her lack of muscle tone (*id.* at 188). On cross-examination, Dr. Stringer testified carpal tunnel syndrome affected the sensation in all three fingers, but it affected the strength of the thumb (*id.* at 192–93). When asked it if was less likely in Petitioner's case that the squeezing of the trigger would accidentally happen, Dr. Stringer stated no; he stated accidentally squeezing the trigger would be more likely because Petitioner would not have good control of what she was holding (*id.* at 193–94). He stated although it would be more difficult for her to squeeze because of the weakness and numbness, she would have less ability to control the strength and more difficulty exerting pressure and knowing how much pressure to use to hold something (*id.*).

Everitt Hill testified he lived behind the Raselys at the time of the shooting (*id.* at 284). He testified he was in his backyard and heard screaming, and then he heard a shot "a little while after" (*id.* at 284–85). When cross-examined by the prosecutor regarding whether he told Investigator Bruening that he did not hear a shot, Mr. Hill denied that he told Bruening he did not hear a shot, which is what Bruening wrote in his report (*id.* at 285–87). Mr. Hill testified he told Investigator Bruening that he heard a female voice screaming "please help" several times (*id.* at 287–88). He testified Investigator Bruening asked him whether the female's voice was loud, or quiet and then got louder, and Investigator Bruening wrote in his report that Hill said, "It was soft," but he (Hill) did not say that (*id.* at 288).

Deputy Jamie Young testified he placed Petitioner in his patrol car the night of the shooting (*id.* at 289). He testified Petitioner appeared upset and was crying, and she said she did not mean to kill him; she thought he was going to hurt her (*id.*).

The defense recalled Vicki Hogan, the 911 operator. She testified Petitioner stated during the 911 call that she was scared for herself and her children (*id.* at 291). Ms. Hogan testified that Petitioner's 911 call was "terrifying" and "horrified" her (*id.*). She described the emotion in Petitioner's voice as "terrified" (*id.*). On re-direct, Ms. Hogan testified that the first words Petitioner spoke was, "Send an ambulance. Send help." (*id.* at 294).

The defense also re-called Kristen Carlo, Petitioner's daughter (*id.* at 295). She testified she had seen her mother with a black eye, and her mother told her Mr. Rasely did it (*id.* at 295–96). She stated she had seen her mother with gashes, "a big one and a couple of little ones" across her back (*id.*). Kristen testified she saw her mom and Mr. Rasely fighting one night, and her mom fell into the coffee table (*id.*). The glass on the table broke, and Mr. Rasely slashed her mom's back with it (*id.* at 296). Kristen testified that when Mr. Rasely became angry at her brother Ryan, Mr. Rasely would "pick him up by the back of his collar" and "put him in the air" (*id.*). Kristen said Ryan would be gagging and choking, and when he said he was choking, Mr. Rasely would say, "No, you're not." (*id.*). Kristen said her mom would intervene and tell Mr. Rasely to put Ryan down (*id.*). Kristen said she was afraid of Mr. Rasely's violence toward her brothers, so she sometimes took the boys into her bedroom and locked the door (*id.* at 298).

Petitioner testified she and her husband were married nearly eight (8) years and had two sons, Ryan and Kevin (*id.* at 303). She testified Kristen was her daughter from a previous marriage (*id.*). Petitioner testified regarding prior acts of violence by her husband (*id.* at 304). She stated her husband had knocked her down, cut her across the "hump" on her back with glass, and given her a black eye (*id.*). Petitioner testified her husband had showed her the gun but had not completely shown her how to use it (*id.* at 304–05). She stated he loaded it and told her to use it if she needed to protect herself or the children (*id.*). Petitioner testified that on the night of the shooting, she had gotten out the suitcases because she was planning to leave. She felt that leaving was the best thing to do because the marriage was over (*id.* at 305–06, 317). The suitcases were sitting out when her husband arrived home (*id.* at 306). Petitioner acknowledged she was upset that her husband was seeing another woman and the marriage was breaking up (*id.* at 311, 323). A couple of days before the shooting, she found a letter in the mail from a Teresa Prichard, the woman with whom she

suspected her husband was having the affair (*id.* at 323). Petitioner acknowledged she called her husband into the bedroom the night of the shooting to continue the discussion in the kitchen/dining area (*id.* at 318). Once in the bedroom, when the discussion turned to her husband's girlfriend, he became irate and a scuffle ensued, and he would not let her out the door (*id.* at 321). Petitioner testified her husband did not hit or kick her, but he ran across the room and slammed her against the door two or three times in an attempt to get her away from the door (*id.* at 306, 324). Once they were out of the bedroom and into the living room, Petitioner followed behind her husband, spraying him with a can of disinfectant aerosol spray to keep him away from her and the children (*id.* at 307, 325). As her husband was leaving the house through the laundry room, she threw her drink at him (*id.* at 329). After her husband left the house, she heard the screen door open again and "panicked." She testified she went to the bedroom at the other end of the house and got the gun (*id.* at 307–08, 331). Petitioner testified she was afraid he would hurt her and the children (*id.* at 307–08). She stated she pleaded with him at the door not to come back inside for the sake of the children, but he opened the door and "came in at me and the gun went off and he fell" (*id.* at 309). She testified she was in fear of great bodily harm to herself and her children (*id.*). Petitioner testified she did not see a phone although she quickly glanced around for one (*id.* at 332–33). Immediately after she shot her husband, however, she asked Kristen to bring her the phone and Kristen did so (*id.* at 352). Petitioner acknowledged she told police that "instead of scaring my husband to stop a fight I shot my husband." (*id.* at 316). Petitioner explained that her intent had been to keep her husband out of the house (*id.* at 316). She stated the only thing she could do to protect herself and her children was to shoot her husband (*id.* at 332). Petitioner acknowledged she never sought medical attention for anything that her husband did to her on prior occasions (*id.* at 334–35). Petitioner also acknowledged it was possible that her husband had been coming back into the house to get his cell phone (*id.* at 336–37). She acknowledged that on prior occasions, her husband left the house scared when he knew she was going to call the police (*id.* at 337). Petitioner claimed the shooting was both accidental and in self-defense (*id.* at 345).

After eighty (80) minutes of deliberation, the jury returned a verdict of guilty of second degree murder as charged (*id.* at 549–52).

V.     PETITIONER'S CLAIMS

A.     Ground One:  "The trial court erred in denying Petitioner's motions for judgement [sic] of acquittal based on insufficient evidence.  U.S. Const. Amend. 14."

Ground Two:  "Trial court erred in denying motion for judgement [sic] of acquittal of second degree murder.  U.S. Const. Amend. 14."

In Ground One Petitioner contends she presented sufficient evidence to support a claim of self-defense at trial (Doc. 1 at 5).[9]  She asserts the State failed to meet its burden of establishing beyond a reasonable doubt that she did not act in self-defense (*id.*).  Therefore, the evidence was insufficient to support her conviction (*id.*).  In Ground Two, Petitioner contends even if the jury rejected her self-defense theory, the evidence was sufficient to show only manslaughter, not second degree murder, because the State failed to prove beyond a reasonable doubt that she acted with a depraved mind, that is, with malice, ill will, hatred, spite, or an evil intent (*id.* at 6).

Respondent concedes Petitioner exhausted both of these claims by presenting them as Issues I and II on direct appeal (Doc. 34 at 15, 34).  Respondent contends Petitioner failed to show that no rational trier of fact could have found proof of guilt beyond a reasonable doubt (*id.* at 15–42).  Therefore, the trial court's denial of the motion for judgment of acquittal and the First DCA's affirming the conviction and sentence were not contrary to or an unreasonable application of clearly established federal law (*id.*).

1.     Clearly Established Federal Law

As an issue of federal law, Petitioner's claim derives from the Fourteenth Amendment due process requirement that the evidence presented at trial be sufficient to convict.  In determining whether Petitioner's conviction was obtained with constitutionally infirm evidence, reference must be made to the substantive elements of the offense as defined by state law.  Jackson v. Virginia, 443 U.S. 307, 324 & n.16, 99 S. Ct. 2781, 2792 n.16, 61 L. Ed. 2d 560 (1979).  To satisfy the constitutional requirement of due process during trial, the State must prove beyond a reasonable doubt every fact that constitutes an essential element of the crime charged against the defendant.  In

---

[9] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073, 25 L. Ed. 2d 368 (1970). When reviewing a claim of insufficient evidence, the proper inquiry is not whether the reviewing court itself believes that the evidence established guilt beyond a reasonable doubt, but "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319 (citation omitted). The court should not reweigh the evidence but should view it in the light most favorable to the jury's verdict. Id. Because jurors are free to evaluate the credibility of testimony and the weight of the evidence, the court should assume that all conflicting inferences were resolved against the defendant. Id. at 326. "It is only where, after viewing the evidence in its most favorable light and making all credibility decisions in favor of the state the evidence still fails to at least preponderate in favor of the state, that we become concerned with conflicting inferences." Cosby v. Jones, 682 F.2d 1373, 1383 (11th Cir. 1982) (footnote omitted). The test under Jackson is a limited one, and it does not require that the evidence rule out every hypothesis except that of guilt beyond a reasonable doubt. Id.; Wilcox v. Ford, 813 F.2d 1140, 1143 (11th Cir. 1987). "The simple fact that the evidence gives some support to the defendant's theory of innocence does not warrant the grant of habeas relief." Wilcox, 813 F.2d at 1143.

2.      Federal Review of State Court Decision

Petitioner raised Grounds One and Two on direct appeal of her conviction, arguing both that the State's evidence failed to rebut, beyond a reasonable doubt, her defense of self-defense, and that the State's evidence was insufficient to establish she acted with a depraved mind and, at best, proved manslaughter (Ex. E at 31–46).

The First DCA affirmed the trial court's denial of Petitioner's motion for judgment of acquittal ("JOA") on the following grounds:

> Appellant first urges the trial court erred in denying her motion for JOA to the charge of second-degree murder, in that the state's evidence was insufficient to rebut her defense of self-defense. She points out that she retrieved the weapon only after her husband was attempting to reenter the house following an altercation between them, and asserts she used the weapon solely to defend herself, because she reasonably believed that without resort to it, her life would have been placed in great danger. We cannot agree that the state's evidence was legally insufficient to submit the case to the jury.

Initially, we note that our review standard of an appeal from a denial of a motion for JOA is de novo, in that such motion presents an issue of law, *i.e.*, whether the evidence is sufficient to support the verdict. *See* Jones v. State, 790 So. 2d 1194, 1197 (Fla. 1st DCA 2001). Moreover, in "moving for a judgment of acquittal, a defendant admits not only the facts stated in the evidence, but also every reasonable conclusion favorable to the state that the trier of fact might fairly infer from the evidence." *See* Sutton v. State, 834 So. 2d 332, 334 (Fla. 5th DCA 2003). The rule is firmly entrenched that "[i]f, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction." Pagan v. State, 830 So. 2d 792, 803 (Fla. 2002).

As applied to the theory of self-defense in particular, the following rules should be taken into consideration regarding the state's burden: The state is required to prove beyond a reasonable doubt that the defendant did not act in self-defense. *See* Brown v. State, 454 So. 2d 596, 598 (Fla. 5th DCA 1984). "If a defendant establishes a prima facie case of self-defense, the state must overcome the defense by rebuttal, or by inference in its case in chief." *See* State v. Rivera, 719 So. 2d 335, 337 (Fla. 5th DCA 1998). Rules applicable to the showing required by a defendant include: A demonstration by him or her of "a real necessity for taking a life and a situation causing a reasonably prudent person to believe that danger is imminent." *See* Hunter v. State, 687 So. 2d 277, 278 (Fla. 5th DCA 1997). *See also* Pressley v. State, 395 So. 2d 1175, 1177 (Fla. 3d DCA 1981). A person may use deadly force in self-defense if he or she reasonably believes such force is necessary to prevent imminent death or great bodily harm. A person may not, however, use deadly force without using every available means to avoid danger, including retreat. *See* Weiand v. State, 732 So. 2d 1044, 1049 (Fla. 1999). One has a limited duty to retreat in one's own home to the extent reasonably possible, but there is no duty to flee the residence. *See id.* at 1056–57. Finally, an appellate court, in reviewing the record in a case where such defense is interposed, is required to heed the rules that "[t]he question of self defense is one of fact, and is one for the jury to decide where the facts are disputed." Dias v. State, 812 So. 2d 487, 491 (Fla. 4th DCA 2002) (citing Scholl v. State, 94 Fla. 1138, 115 So. 43, 44 (1927)). "A motion for judgment of acquittal should not be granted unless 'the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law.'" *See* Hernandez v. State, 842 So. 2d 1049, 1051 (Fla. 4th DCA 2003), quoting Lynch v. State, 293 So. 2d 44, 45 (Fla. 1974).

In applying the above rules to the conflicting facts at bar, we note that in addition to the evidence appellant presented in support of her self-defense theory, the state submitted evidence from which the jury could reasonably infer that appellant acted out of anger and jealousy because she had discovered that the husband/victim

was having an extramarital affair. The evidence, in its entirety, was susceptible of two views, either justifiable self-defense, or an act arising out of jealousy and anger from the fact that the husband was having an affair. *See generally* <u>Hoffman v. State</u>, 708 So. 2d 962, 964 (Fla. 5th DCA 1998). Because the record, in our judgment, contains sufficient evidence from which the jury could conclude that appellant had other reasonable options besides that of deadly force to avoid the danger posed by her husband's advance, including retreat, we agree that the lower court did not err in denying the motion for JOA, as applied to her theory of self defense.

We similarly reject appellant's argument that the trial court erred in denying her motion for JOA as to the offense of second-degree murder, on the ground that the state's evidence at most proved only the lesser offense of manslaughter. The same general rules pertaining to motions for JOA, recited above, are, of course, applicable as well to the issue regarding the sufficiency of the evidence supporting the offense of second-degree murder.

Initially, we consider it helpful to note the distinctions between the elements essential for convictions of second-degree murder and manslaughter. Second degree murder is defined as follows:

> The unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual. . . .

*See* § 782.04(2), Fla. Stat. (2001). The term "imminently dangerous to another and evincing a depraved mind regardless of human life" is defined as an act or series of acts that:

> 1. a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another, and

> 2. is done from ill will, hatred, spite or an evil intent, and

> 3. is of such a nature that the act itself indicates an indifference to human life.

*See* Fla. Std. Jury Instr. (Crim.) 7.4; <u>Sigler v. State</u>, 805 So. 2d 32, 34 (Fla. 4th DCA 2001), *review denied*, 823 So. 2d 126 (Fla. 2002); <u>Duckett v. State</u>, 686 So. 2d 662, 663 (Fla. 2d DCA 1996). All three of the above elements must be satisfied. The question, as it specifically relates to the issue before us, similar to that in <u>Light v. State</u>, 841 So. 2d 623, 626 (Fla. 2d DCA 2003), is whether the evidence relating to

the second element, *i.e.*, that of ill will, *et cetera*, was legally sufficient. If not, the conviction of second-degree murder should be reduced to the lesser-included offense of manslaughter.

Manslaughter is defined in section 782.07(1), Florida Statutes (2001), as:

(1) The killing of a human being by the act, procurement, or culpable negligence of another, without lawful justification according to the provisions of chapter 776 and in cases in which such killing shall not be excusable homicide or murder, according to the provisions of this chapter, is manslaughter, a felony of the second degree. . . .

Given the extremely deferential standard applicable to the review of denials of motions for JOA, we are unable to say that the evidence is such that there is no view which the jury could take of it favorable to the state that can be lawfully sustained. In other words, once the evidence is viewed in the light most favorable to the state, we are unable to conclude that a rational trier of fact could not lawfully find that the evidence proved the existence of all the elements of the crime of second-degree murder beyond a reasonable doubt. FN3

FN3. Pursuant to agreement of counsel, the trial court instructed the jury on manslaughter by intentional act, and that if the jury concluded appellant did not act intentionally, it could not find her guilty of the lesser included offense of manslaughter.

Rasley v. State, 878 So. 2d 473, 476–78 (Fla. 1st DCA 2004).

This court must defer to the state court's determinations as to (1) the legal elements of second degree murder and manslaughter at the time of Petitioner's offense conduct, and (2) the State's burden of proof with respect to Petitioner's theory of self-defense. *See* Bradshaw v. Richey, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005) ("[A] state court's interpretation of state law . . . binds a federal court sitting in habeas corpus."); Mullaney v. Wilbur, 421 U.S. 684, 691, 95 S. Ct. 1881, 1886, 44 L. Ed. 2d 508 (1975) ("State courts are the ultimate expositors of state law," and federal courts must therefore abide by their rulings on matters of state law) (citations and footnote omitted); Carrizales v. Wainwright, 699 F.2d 1053, 1055 (11th Cir. 1983).

The First DCA applied the following legal standard to Petitioner's sufficiency of the evidence claims: "[i]f, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient

evidence exists to sustain a conviction." Rasley, 878 So. 2d at 476. This is the Supreme Court standard set forth in Jackson v. Virginia, *supra*. Therefore, the state court's adjudication of the claims was not contrary to clearly established federal law; and Petitioner is entitled to relief only if she demonstrates that the state court unreasonably applied Jackson v. Virginia.

As the state court noted, there was sufficient evidence from which the jury could conclude beyond a reasonable doubt that Petitioner had other reasonable options besides the use of deadly force to avoid the danger posed by her husband's advance, including evidence that the victim was unarmed, and Petitioner had no signs of physical injury. Further, the evidence that Petitioner had discovered that her husband (the victim) was having an extramarital affair and was in the process of packing suitcases to move out of town, as well as the fact that Petitioner purposely pointed the gun at her husband, was sufficient from which the jury could reasonably infer she acted out of anger and jealousy, which was sufficient to show ill will, hatred, spite, or an evil intent. *Compare* Hines v. State, 227 So. 2d 334 (Fla. 1st DCA 1969) (act of purposely pointing gun at deceased's head from a very short distance and telling deceased that he "had a gun" and that she (the deceased) "should go out . . . and act like a squirrel and if he killed her . . . it wouldn't be no accident," certainly implied malice sufficient to support conviction for second degree murder even if defendant did not intend that the gun would fire), *and* Grissom v. State, 237 So. 2d 57 (Fla. 3d DCA 1970) (evidence was sufficient to support conviction for second degree murder of student where defendant, a junior high school student, was disciplined by a teacher for a rule violation; upon being disciplined, the defendant threatened to return and kill the teacher; a short time later he did return armed with a handgun and fired two shots at the teacher, wounding but not killing him; and while fleeing the building after shooting the teacher, he fired one shot up a stairway in the school building that struck and killed a student standing on the stairs), *with* Manuel v. State, 344 So. 2d 1317 (Fla. 3d DCA 1977) (defendant's act of pointing gun in a direction where one would think a shot could <u>not</u> result in harm to any person is conduct that falls far short of malice required to support conviction for second degree murder).

Since a rational trier of fact could have found guilt beyond a reasonable doubt as to second degree murder, Petitioner failed to establish that the state court's adjudication of her federal due

process claims was based upon an unreasonable determination of the facts, or was contrary to or an unreasonable application of clearly established Supreme Court law.  Therefore, Petitioner is not entitled to federal habeas relief on Ground One or Ground Two.

      B.    <u>Ground Three:  "Trial counsel was ineffective for failing to request jury instructions that Petitioner was on psychotropic medication during trial."</u>

          <u>Ground Four:  "Trial counsel was ineffective for failing to object to prosecutor's improper arguments and comments.  U.S. Const. Amend. 6."</u>

          <u>Ground Six:  "Counsel was ineffective in his misrepresentation by forcing the Petitioner to testify in her defense."</u>

          <u>Ground Seven:  "Counsel was ineffective for failing to challenge the competency of child witness."</u>

          <u>Ground Nine:  "Counsel was ineffective for failing to call Sheryl Mills as a defense witness at trial."</u>

          <u>Ground Eleven:  "Counsel was ineffective for failing to investigate victim's military records and call Navy Ombudsman as a witness."</u>

          <u>Ground Twelve:  "Counsel was ineffective for failing to investigate and introduce prior police records of domestic violence."</u>

          <u>Ground Thirteen:  "Counsel was ineffective for failing to call Petitioner's neighbors as defense witnesses."</u>

In Grounds Three, Four, Six, Seven, Nine, Eleven, Twelve, and Thirteen, Petitioner raises eight claims of ineffective assistance of trial counsel (Doc. 1 at 8–10, 13–14, 16, 18–20). Respondent contends Petitioner raised all of these claims in her Rule 3.850 motion (Doc. 24 at 43, 50, 56–57, 76, 83–85 ).  Respondent states the state circuit court denied the motion after holding a limited evidentiary hearing on some claims (*id.* at 46).  Respondent states Petitioner appealed the circuit court's denial of the motion to the First DCA, but presented only three (3) claims in her initial brief on appeal, that is Grounds Eight, Ten, and Fourteen (asserted as Grounds Nine, Thirteen, and Nineteen in her Rule 3.850 motion), which grounds are identified and discussed *infra*  (*id.* at 43).

Respondent contends Florida law provides that where an evidentiary hearing is held in a Rule 3.850 proceeding, post-conviction claims not included in the initial brief on appeal are deemed

abandoned (*id.* at 43–46). Respondent cites several state cases in support of this position (*id.*). Respondent contends Petitioner cannot now take a second appeal from the denial of her Rule 3.850 motion (*id.* at 46). Moreover, Petitioner's pro se motion for rehearing, in which she requested that the appellate court review issues that were not briefed by her appellate counsel (including Grounds Three, Four, Six, Seven, Nine, Eleven, Twelve, and Thirteen of the instant petition), did not constitute proper presentation of those issues for appellate review (*id.* at 47–49). Therefore, Grounds Three, Four, Six, Seven, Nine, Eleven, Twelve, and Thirteen are procedurally defaulted and procedurally barred from federal review.

The state court record confirms that Petitioner raised Grounds Three, Four, Six, Seven, Nine, Eleven, Twelve, and Thirteen in her Rule 3.850 motion as Grounds Two, Three, Six, Seven, Twelve, Fifteen, Seventeen, and Eighteen, respectively (Ex. J). The state circuit court summarily denied some issues (Ex. N) and denied the remaining issues after holding an evidentiary hearing (Ex. Q, R). In Petitioner's appellate brief, Petitioner's counsel raised only three issues, none of which were the issues raised as Grounds Three, Four, Six, Seven, Nine, Eleven, Twelve, and Thirteen in the instant federal petition (Ex. S). The State filed an answer brief addressing only the three issues presented in Petitioner's initial brief (Ex. T). The First DCA affirmed the lower court's decision denying Petitioner's Rule 3.850 motion (Ex. V). Petitioner filed a pro se motion for rehearing requesting that the appellate court review claims that were not briefed by her appellate counsel (including Grounds Three, Four, Six, Seven, Nine, Eleven, Twelve, and Thirteen of the instant petition), some of which were summarily denied by the state circuit court (Ex. X). The First DCA denied the motion for rehearing (Ex. Y).

To resolve the exhaustion argument presented by Respondent, the court must determine whether Petitioner properly preserved for appellate review claims that were denied by the state circuit court (either summarily or following the evidentiary hearing) and not argued by Petitioner in her initial brief on appeal of the state circuit court's decision. The Florida Rules of Appellate procedure provide that in a case where a movant's Rule 3.850 motion is denied after an evidentiary hearing, a movant wishing to appeal the denial of his motion must file an initial brief. *See* Fla. R. App. P. 9.141(b)(3); *see also* <u>Pennington v. State</u>, 34 So. 3d 151, 153 at n.1 (Fla. 1st DCA 2010)

(briefing is required in appeal from non-summary denial of Rule 3.850 motion). It is well established in Florida courts that claims for which an appellant has not presented any argument, or for which she provides only conclusory argument, are insufficiently presented for review and are waived. *See* Gamble v. State, 877 So. 2d 706 (Fla. 2004); Reed v. State, 875 So. 2d 415 (Fla. 2004); Cooper v. State, 856 So. 2d 969, 977 n.7 (Fla. 2003); Marshall v. State, 854 So. 2d 1235, 1252 (Fla. 2003) Sweet v. State, 810 So. 2d 854, 870 (Fla. 2002); Johnson v. State, 769 So. 2d 990, 1005–06 (Fla. 2000); Shere v. State, 742 So. 2d 215, 217 n.6 (Fla. 1999); Duest v. Dugger, 555 So. 2d 849, 852 (Fla. 1990) ("Merely making reference to arguments below without further elucidation does not suffice to preserve issues, and these claims are deemed to have been waived."). Florida courts consistently apply this rule, even in cases where a post-conviction evidentiary hearing is limited in scope to some but not all post-conviction claims; thus a movant wishing to preserve any claims for appellate review, whether summarily denied or not, must present argument on those issues in her initial brief.[10] *See* Prince v. State, 40 So. 3d 11 (Fla. 4th DCA 2010); Hammond v. State, 34 So. 3d 58 (Fla. 4th DCA 2010) (claim for which appellant did not present argument, or for which he provided only conclusory argument, was insufficiently presented for appellate review, regardless of whether claim was among those claims litigated at evidentiary hearing or among those claims summarily denied by trial court); Williams v. State, 24 So. 3d 1252 (Fla. 1st DCA 2009) (where appellant received evidentiary hearing on some of his post-conviction claims and others were summarily denied, appellate court would review only those summarily denied claims which movant argued in appellate brief); *see also* Ward v. State, 19 So. 3d 1060, 1061 (Fla. 5th DCA 2009) (en banc) (where all of appellant's post-conviction claims were summarily denied, but appellant chose to file initial brief on appeal (even though not required to do so under Fla R. App. P. 9.141(b)(2)), appellant abandoned any issues not addressed in initial brief); Watson v. State, 975 So. 2d 572 (Fla. 1st DCA 2008) (same); Austin v. State, 968 So. 2d 1049 (Fla. 5th DCA 2007) (same)).

---

[10] Even if the Florida appellate courts were not absolutely consistent in applying this rule, such is not required to permit a federal court to conclude that a state procedural rule is adequate for federal habeas purposes. *See* Maples v. Allen, 586 F.3d 879, 888 (11th Cir. 2009) (while "regularly followed" means "closely hewn to," it does not mean complete unanimity or absolute consistency of state decisions applying the rule) (citations omitted).

The undersigned thus concludes that the Florida procedural rule deeming as waived or abandoned those claims for which an appellant has not presented any argument in her appellate brief (or for which she provides only conclusory argument), even when the insufficiently presented claims were summarily denied by the trial court, is a firmly established and regularly followed procedural rule for purposes of federal habeas. *See, e.g.*, Corn v. McNeil, No. 3:08cv199-MCR-EMT, 2010 WL 5811343 (N.D. Fla. Nov. 24, 2010) (unpublished), *Report and Recommendation adopted*, 2011 WL 88713 (N.D. Fla. Feb. 10, 2011); Ross v. McNeil, 5:07-cv-219-RS-EMT, 2010 WL 2179039 (N.D. Fla. Apr. 14, 2010) (unpublished), *Report and Recommendation adopted*, 2010 WL 2179037 (N.D. Fla. May 28, 2010) (unpublished), *cert. of appealability denied*, No. 10-13013-A (11th Cir. Oct. 4, 2010) (certificate of appealability sought on issue of whether Florida's procedural rule, that defendant waived or abandoned appellate review of post-conviction claims that were summarily denied and not addressed in defendant's appellate brief, where trial court held evidentiary hearing on other claims, was firmly established and regularly followed); Sharp v. McNeil, No. 4:07-cv-17-MP-MD, 2009 WL 981594, at **13–14 (N.D. Fla. Apr. 10, 2009) (unpublished); Durain v. McNeil, No. 2:08-cv-24-FTM-29DNF, 2008 WL 4888989, at *9 (M.D. Fla. Nov. 12, 2008) (unpublished); Williams v. McDonough, No. 8:02-CV-965-T-30MAP, 2007 WL 2330794, at **1–2 (M.D. Fla. Aug. 14, 2007) (unpublished); Walker v. Sec'y, Dep't of Corr., No. 8:05-cv-1539-T-17MAP, 2007 WL 1747181, at *4 (M.D. Fla. June 18, 2007) (unpublished).[11]

Additionally, Rule 9.330(a) of the Florida Rules of Appellate Procedure prohibits parties from presenting in a motion for rehearing issues which were not previously raised, unless it is a basis to affirm the judgment under review. *See* Jaworski v. State, 804 So. 2d 415, 419 (Fla. 4th DCA 2001) (emphasis added). This rule is firmly established in the state procedural rules and regularly followed. *See* Cleveland v. State, 887 So. 2d 362, 364 (Fla. 5th DCA 2004); Sarmiento v. State, 371 So. 2d 1047, 1052–53 (Fla. 3d DCA 1979); Price Wise Buying Group v. Nuzum, 343 So. 2d 115 (Fla. 1st DCA 1977).

---

[11] The undersigned cites Corn, Ross, Sharp, Durain, Williams, and Walker only as persuasive authority and recognizes that the opinions are not considered binding precedent.

Therefore, the undersigned agrees with Respondent's position that Petitioner's Grounds Three, Four, Six, Seven, Nine, Eleven, Twelve, and Thirteen were not properly exhausted in the state courts. Additionally, Petitioner has no available avenue through she may properly exhaust her claims in the state court. Therefore, the claims are considered procedurally defaulted.

Moreover, Petitioner has failed to show cause for her failure to properly exhaust Grounds Three, Four, Six, Seven, Nine, Eleven, Twelve, and Thirteen. In her reply, Petitioner asserts she was prevented from raising Grounds Three, Four, Six, Seven, Nine, Eleven, Twelve, and Thirteen on appeal of her Rule 3.850 motion because her appellate counsel was ineffective for failing to raise the issues in the initial brief, and Florida law prohibits represented parties form filing pro se briefs (Doc. 38 at 3–8). It is well established that there is no constitutional right to an attorney in state post-conviction proceedings; therefore, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings as cause for a procedural default. *See* Coleman, 501 U.S. at 752–53; Maples, 586 F.3d at 891 (citations omitted). Since Petitioner has failed to satisfy the "cause and prejudice" exception to the procedural bar, and she does not allege she is entitled to review of her claims through any other recognized exception to the procedural bar, she is not entitled to federal review of Grounds Three, Four, Six, Seven, Nine, Eleven, Twelve, and Thirteen.

C.     Ground Five: "Imposition of twenty-five (25) year minimum mandatory enhanced sentence was unlawful where jury failed to make a specific finding that Petitioner discharged firearm resulting in death. Counsel was ineffective for recommending that Petitioner agree to jury's finding on possession of firearm."

Petitioner contends trial counsel performed ineffectively by advising her to stipulate that the jury's determination that she possessed a firearm was sufficient to impose the minimum mandatory 25-year sentence for discharge of a firearm resulting in death or great bodily harm (Doc. 1 at 12).

Respondent contends this claim was not properly exhausted (Doc. 34 at 51–55). Respondent concedes Petitioner raised claims of ineffective assistance of counsel and trial court error with respect to the sentence enhancement as Grounds Four and Five, respectively, in her Rule 3.850 motion (*id.* at 51–52). Respondent argues Petitioner failed to exhaust the claims because she did not raise the issues in her initial brief on appeal of the state circuit court's denial of the Rule 3.850 motion (*id.* at 52). Additionally, with regard to the claim of trial court error (raised as Ground Five

in Petitioner's Rule 3.850 motion), the state circuit court denied the claim on the independent and adequate state procedural rule prohibiting successive review of claims that were previously raised and decided (finding that Petitioner previously raised the claim in her Rule 3.800(b)(2) motion) (*id.* at 52–55). Moreover, although Petitioner presented the claim of trial court error in her Rule 3.800(b)(2) motion, she procedurally defaulted the claim because she failed to raise the issue in her brief on direct appeal, which was the procedurally proper means of exhausting the claim (*id.*). Therefore, both of the claims are procedurally barred from federal review (*id.* at 51–55).

Review of the record confirms that in Ground Four of Petitioner's Rule 3.850 motion, she raised a claim of ineffective assistance of counsel regarding counsel's advising her to agree that the jury's finding that she possessed a weapon was a sufficient basis for imposing the 25-year minimum mandatory sentence enhancement for discharge of a firearm resulting in death or great bodily harm (Ex. J). The state circuit court summarily denied the claim (Ex. N). Petitioner did not argue this issue in her initial brief on appeal of the circuit court's denial of the Rule 3.850 motion (*see* Ex. S). For the reasons discussed *supra* in Section V.B., the undersigned concludes this constituted a procedural default which precludes federal review of the claim.

Similarly with respect to Petitioner's claim of trial court error in imposing the 25-year sentence enhancement absent a jury finding that she discharged a firearm resulting in death or great bodily harm, Petitioner procedurally defaulted this claim by failing to raise it on direct appeal of her conviction and sentence after the trial court denied her Rule 3.800(b)(2) motion in which she raised this claim (*see* Exs. AA, BB, E). Before the initial brief on direct appeal was filed, Petitioner filed a motion to correct sentencing error, pursuant to Rule 3.800(b)(2) of the Florida Rules of Criminal Procedure (Ex. AA). She raised three issues in her motion: (1) the jury's specific finding that she used a firearm in the commission of the offense was legally insufficient to support the imposition of a 25-years minimum mandatory sentence because the jury was not asked to find that the firearm was discharged causing death or great bodily harm; (2) the jury was not properly instructed that it must apply the "beyond a reasonable doubt" standard in making its findings, as required by Apprendi v. New Jersey, 530 U.S. 466 (2000); and (3) the imposition of the 25-year minimum mandatory term constituted a double enhancement (Ex. AA). The trial court denied the Rule 3.800(b)(2) motion (Ex.

BB).  In Petitioner's initial brief on direct appeal, she raised only the argument that the 25-year minimum mandatory term was a double enhancement (as well as her two claims of trial court error in denying the motions for judgment of acquittal) (Ex. E, Issue III).  Petitioner did not raise the issue she raises here, that is, imposition of twenty-five (25) year minimum mandatory was unlawful because the jury failed to make a specific finding that she discharged the firearm resulting in death (*id.*).  Since Petitioner did not exhaust her state court remedies with respect to her claim of trial court error, the claim is procedurally defaulted for federal habeas purposes.

Petitioner failed to establish she is entitled to review under the "cause and prejudice" exception or any other exception to the procedural bar.  Therefore, both aspects of Ground Five (the claim of ineffective assistance of counsel and trial court error) are procedurally barred from federal review.

D.    Ground Eight:  "Counsel was ineffective for failing to raise Battered Woman Syndrome as a defense and to call expert witness for defense."

Petitioner states she asserted self-defense and accidental shooting as defenses at trial (Doc. 1 at 15).  She asserts defense counsel was well aware of the abuse inflicted upon her and her children by the victim (*id.*).  She contends defense counsel should have retained an expert on Battered Woman Syndrome and pursued it as a defense (*id.*).  Petitioner contends a Battered Woman Syndrome defense would have shown the jury that she reasonably feared she and her children were in imminent danger of harm form the victim due to his propensity for violence and escalating violence (*id.*).  Petitioner argues the jury would have had reasonable doubt as to her guilt if defense counsel had presented this defense (*id.*).

Respondent concedes that Petitioner exhausted this claim of ineffective assistance of counsel by presenting it as Ground Nine in her Rule 3.850 motion and appealing the trial court's denial of the claim to the First DCA (Doc. 34 at 58).  However, Respondent contends Petitioner is not entitled to federal habeas relief because she failed to establish that the state court's adjudication of the claim was based upon an unreasonable determination of the facts or was contrary to or an unreasonable application of clearly established federal law (*id.* at 61–75).

1.    Clearly Established Supreme Court Law

The clearly established federal standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1994). To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. 466 U.S. at 687–88. If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. Id. at 697. Thus, this court need not address the prejudice prong if the court determines that the performance prong is not satisfied. Turner v. Crosby, 339 F.3d 1247, 1279 (11th Cir. 2003); Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation omitted).

Pursuant to Strickland, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Strickland, 466 U.S. at 691. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. Id. "One of the primary duties defense counsel owes to his client is the duty to prepare himself adequately prior" to a legal proceeding. Lawhorn v. Allen, 519 F.3d 1272, 1295 (11th Cir. 2008) (quoting Magill v. Dugger, 824 F.2d 879, 886 (11th Cir. 1987)). Such preparation includes an understanding of the legal procedures and the legal significance of tactical decisions within those proceedings. Young v. Zant, 677 F.2d 792, 794, 799–800 (11th Cir. 1982) (an attorney's reliance on former law and unawareness of procedure deprived his client of effective assistance). Counsel's decision whether to call a particular witness is a matter of trial strategy entitled to great deference. Chandler, 218 F.3d at 1314 n.14 (citing Waters v. Thomas, 46 F.3d 1506, 1512, 1518–19 (11th Cir. 1995) (en banc)). "Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would

have testified are largely speculative." Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978).[12]

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688–89. "Judicial scrutiny of counsel's performance must be highly deferential." Id. at 689. If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15). Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").

As stated by the Eleventh Circuit:

> No absolute rules dictate what is reasonable performance for lawyers. [citing Strickland, 104 S.Ct. at 2065; other citations omitted]. "Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." Strickland, 104 S. Ct. at 2065; [other citations omitted]. The law must allow for bold and for innovative approaches by trial lawyers. And, the Sixth Amendment is not meant "to improve the quality of legal representation," but "simply to ensure that criminal defendants receive a fair trial." Strickland, 104 S. Ct. at 2065.

Chandler, 218 F.3d at 1307. However, not every strategic decision passes constitutional muster. Whether a particular decision by counsel was a tactical one is a question of fact, Hardwick v. Crosby, 320 F.3d 1127, 1163 (11th Cir. 2003), and the state court's resolution of that issue enjoys a strong presumption of correctness. See 28 U.S.C. § 2254(e)(1); Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995); Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991). Whether a particular tactical

---

[12] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all former Fifth Circuit decisions rendered before October 1, 1981.

decision was a reasonable one, however, is a question of law, <u>Hardwick</u> 320 F.3d at 1163; <u>Jackson</u>, 42 F.3d at 1367; <u>Horton</u>, 941 F.2d at 1462. In determining whether counsel's decision was reasonable, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." <u>Strickland</u>, 466 U.S. at 689. Specifically with regard to trial counsel's duty to investigate his client's case, the Supreme Court has held that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary" and that "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 690–91,

As to the prejudice prong of the <u>Strickland</u> standard, Petitioner's burden of demonstrating prejudice is high. <u>Wellington v. Moore</u>, 314 F.3d 1256, 1260 (11th Cir. 2002). The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* (quoting <u>Strickland</u>, 466 U.S. at 693). However, the Court has also clarified that a petitioner need not demonstrate it 'more likely than not, or prove by a preponderance of evidence,' that counsel's errors affected the outcome. <u>Strickland</u>, 466 U.S. at 693–94. Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694. Indeed, it would be "contrary to" the law clearly established in <u>Strickland</u> for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence. <u>Williams v. Taylor</u>, 529 U.S. at 405–406.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. <u>Strickland</u>, 466 U.S. at 694–95. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

2.      Federal Review of State Court Decision

Petitioner raised this ineffective assistance of counsel claim as Ground Nine in her Rule 3.850 motion (Ex. J).  The trial court held an evidentiary hearing on this claim, at which Petitioner was represented by counsel (*see* Ex. Q).  Following the evidentiary hearing, the trial court denied the claim (Ex. R).  That decision was affirmed by the First DCA (Ex. V).  While the affirmance was a per curiam opinion without reasoning, this court presumes that the First DCA's decision affirms the reasoning, as well as the judgment of the circuit court.  "'Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.'"  Sweet v. Sec'y Dept. of Corr., 467 F.3d 1311, 1316–17 (11th Cir. 2006) (quoting Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S. Ct. 2590, 2594, 115 L. Ed. 2d 706 (1991)); *see also* Harmon v. Barton, 894 F.2d 1268, 1273 (11th Cir. 1990) (noting that the "clear inference" to be drawn from a per curiam affirmance without written opinion is that the appellate court "accepted not only the judgment but the reasoning of the trial court.").

In the state circuit court's written opinion denying Petitioner's claim, the court found as fact that defense counsel, Mr. John Daniel, had "decades of experience to draw from." (Ex. R at 285). The court noted that Mr. Daniel was locally known as a "double-barrel defense attorney," who "knows his craft." (*id.* at 285–86).  The court found that Mr. Daniel made a tactical decision not to pursue a battered woman defense (*id.* at 286).  The court based this finding on Mr. Daniel's testimony at the evidentiary hearing that he considered several factors associated with the presentation of a battered woman defense and consulted with another lawyer who was well-practiced in the area, and then decided that a self-defense theory would be stronger than a battered woman theory (*id.*).  The state circuit court concluded that Mr. Daniel's tactical decision was "well-considered" (*id.*).  Therefore, Petitioner failed to show she received ineffective assistance in this regard (*id.*).

Although the state court did not cite Strickland, it denied Petitioner's claim on the ground that defense counsel's failure to present a battered woman's syndrome defense was a reasonable, tactical decision.  In so concluding, the court determined that Petitioner failed to show that counsel

performed deficiently, which is the first prong of the <u>Strickland</u> standard. Therefore, Petitioner is not entitled to relief under the "contrary to" provision of § 2254(d)(1).

Additionally, Petitioner has failed to show, by clear and convincing evidence, that the state court's factual findings were unreasonable. The transcript of the post-conviction evidentiary hearing demonstrates that the state court's factual findings were reasonable in light of the evidence presented at the evidentiary hearing, a summary of which follows.

Petitioner testified that on the night before the shooting, her husband attacked their 8-year old son, kicking and choking and strangling him (Ex. Q at 315). When Petitioner threatened to call the police, her husband came at her and said he was going to beat her face in and kill her if she phoned the police (*id.*). The following day, Petitioner was very upset and nervous and afraid (*id.*). She called Petitioner at his job and requested that he not come home after work because a friend of her daughter's was spending the night (*id.* at 315–16). She also told Petitioner that day that she was moving out of the home with the children because of his abuse toward her and the children (*id.* at 317). Petitioner did not want to live with her husband anymore because he was dangerous and she was afraid of him (*id.*). When Petitioner mentioned the name of the woman with whom her husband was having an affair, he became violent and the events leading up to the shooting began (*id.* at 318). Her husband began kicking the son, and Petitioner sprayed her husband with an aerosol can so that he would come after her and leave their son alone (*id.*). Petitioner's husband then went after her daughter, and Petitioner threw a drink at him to divert him (*id.*). He then left the home (*id.* at 319). As Petitioner was standing in the kitchen catching her breath, she heard keys going in to the locked door (*id.*). The children began screaming, and she yelled for someone to get her the phone (*id.*). She ran down the hall and got the gun and pointed it up to the ceiling in an attempt to try to hold him back, to keep him at a distance (*id.* at 320). Her husband then entered the house and said something like "F you, bitch" and lunged at her (*id.*). Petitioner flinched and said "no," and when she jumped the gun fired, and her husband was hit and immediately fell down (*id.*). She did not even know that he had been struck by a bullet (*id.*). Petitioner testified that although she was made out at trial to look like a woman who was jealous that her husband was having an affair, she is not a jealous woman (*id.* at 321). She stated her belief that Mr. Daniel should have presented an expert witness

on battered woman syndrome (*id.*).  She testified that before the shooting incident, there had been three or four violent incidents between her and her husband reported to police (*id.* at 328).  She stated there were quite a few incidents of violence inflicted upon the children, although none were reported to police (*id.*).  She testified that Petitioner abused the children on a daily basis from the time the children were in diapers, and the violence became progressively worse and more dangerous (*id.* at 328–29).  She testified the violence "scared me to death constantly," and it affected her children (*id.* at 329).  She testified she would not leave her husband alone with the children (*id.*).  She testified that if a battered woman expert had been called to testify for the defense, this testimony would have assisted the jury in understanding that she shot her husband because she reasonably believed he was going to hurt her or her children (*id.* at 330).  Petitioner stated she discussed this with Mr. Daniel and was under the impression that he was going to have an expert testify at trial (*id.* at 332).  However, no expert was presented, and the prosecutor was able to discredit her story without the benefit of an expert to back up her version of events (*id.*).

On cross-examination at the evidentiary hearing, the prosecutor questioned Petitioner about the prior alleged instances of abuse in which she called police:

Q.  . . . and you testified that on at least three to four occasions you actually called the police and the Bay County Sheriff's Office responded?

A.  Yes.

Q.  Did you have an opportunity to look at the police reports that were provided in discovery to Mr. Daniel?

A.  No, I don't think so.

Q.  Would it affect your opinion, and this is kind of cross referencing two different grounds, would it affect your opinion at all as to whether or not he should have introduced those reports and would it affect your opinion as to whether or not Battered Wife, Battered Spouse Syndrome would be an appropriate defense if in each and every one of those reports the Bay County Sheriff's Office made the determination that you were the aggressor and not your husband?

A.  But that's not true.

Q.  I understand that. But would that affect —

A.    And that's where, that is where a Battered Women's expert's testimony can come in and explain what they do by the time the police get there. This is their little ploy, you know. They're the ones that are the beaters and the ragers and then, of course, we are women we're emotional, we're crying, we're upset, by the time the police get there they act like everything's fine, everything's wonderful.

Q.    Well, Ms. Rasley, part of that was they saw no marks or bruises on your body.

A.    That's impossible. The one time I ran across the street from him in a ripped nightgown and I had blood on my back.

Q.    I'm just telling you what the report says.

A.    Okay.

Q.    Would it affect your, would it affect your opinion about whether or not Mr. Daniel should have introduced those reports if they, in fact, said what I'm telling you said?

A.    It doesn't matter. It still, they were phoned [sic], I don't know, per se, how it might affect anything but they were phoned and I was injured. And there was one time an ambulance even came to my home. And that was the night that I was severely injured on my back.

Q.    Would you agree with me that Mr. Daniel had a valid reason, if they were against your interest, for not introducing those reports if they said that?

A.    No.

Q.    No?

A.    Maybe not, no.

Q.    You would still want that information in front of a jury? That the Sheriff's Office when they responded determined that you were the aggressor?

A.    I just never really fully understand, determined to be aggressor, not in my mind.

Q.    Well, I understand that. But they didn't arrest, they didn't arrest either party, right?

A.    Right, but that doesn't mean that that makes me the aggressor.

Q.    But they made a finding that you were?

A.    Oh, okay, I would have to see —

Q.    I'm not saying it was right or wrong, I wasn't there, Ms. Rasley,  I'm just saying —

A.    — no, I would have to see that police report to where it says Ms. Kimberly Dawn Rasley was the aggressor.

Q.    Okay.  As to the, Grounds 12 and 13, the failure to call Cheryl [sic] Mills and Ryan Rasley.  Specifically, Ms. Mills, did you have an opportunity to read her deposition?

A.    Yes, I did.

Q.    Did you read where she had made a statement that she had heard you threaten to kill your husband?

A.    No.

Q.    Okay. Would you agree that that would be a damaging piece of evidence if it were brought out at trial?

A.    That's not the, that's not the piece of paper or the —

Q.    Did she give a statement to police officers to that effect, that she had heard that statement come from you?

A.    No.

Q.    Okay.

(Ex. Q at 345–48).

Following Petitioner's testimony, Petitioner's post-conviction counsel offered to proffer the testimony of Dr. Laura Honnecker, a battered woman expert, or, in the alternative, suggested recessing the hearing to present her live testimony (Ex. Q at 357).  The judge responded that he would wait to determine whether her testimony was necessary after hearing from Mr. Daniel regarding his tactics in the case (*id.* at 358).

Attorney John Daniel testified that he had been a criminal defense attorney in Bay County for thirty-five (35) years (*id.* at 360). Mr. Daniel testified that he considered battered woman's syndrome and, based upon his experience and his assessment of the case, chose not to pursue it in Petitioner's case (*id.* at 364). Mr. Daniel testified:

> A. The Battered Spouse Syndrome, Judge, is a double edged sword, very similar at that memory [sic] to the insanity. You get the experts appointed, you play the expert game but also the State has their own expert that can then sit down and interview Ms. Rasley. I don't think it's a very effective defense when you compare it to self defense. I discussed it with her the first day she was in my office. I had a book it's called Selected Cases of, [sic] Women's Self Defense. Paul's got it now, a little green book, I pulled it out. She was sitting directly across from me and I asked her to read it and take it with her. Laid it right in front of her and it covered battered spouse and it covered women's self defense. And at the end of the day when she walked out of my office she left it laying right there. She didn't bother to take it with her, didn't bother to read it. That's what sticks out in my mind completely.

> Q. Did you discuss with other attorneys whether or not you should pursue Battered Spouse Syndrome as a defense?

> A. I did.

> Q. Do you recall who you discussed that with?

> A. Walt Smith had her before I did. Walt and I ran into each other and it was either in a parking lot or in Walt's office and we talked about Battered Spouse and his opinion about Battered Spouse is the same as mine.

> Q. So it was a tactical decision on your part?

> A. Yes, sir, it was.

(Ex. Q at 364–65). Mr. Daniel further testified that he elected not to present the testimony of Sheryl Mills because Mills told him that Petitioner told her that she (Petitioner) would kill her (Petitioner's) husband (*id.* at 365–66). Mr. Daniel made the tactical decision not to present Ms. Mills' testimony, and he informed Petitioner of this (*id.* at 366). Mr. Daniel testified that he also made the decision

not to introduce the police reports because "there was some bad stuff in there too" and because he was able to elicit the necessary information regarding prior violence through Petitioner's testimony (*id.* at 368–69). When asked why he did not at the very least have Petitioner evaluated by a battered spouse expert prior to trial, Mr. Daniel responded:

> I spent a lot of time with her, went through the details with her. I've done a number of these before, women's self defense and she just didn't meet it, she just wasn't there. The prior acts of violence didn't rise to that level in my opinion, the ones she told me about, and then just getting to Battered Spouse . . . [t]hat opens too many doors, it gives him a chance to take his expert and cross examine her and depose her in effect and wasn't [sic] going to do it.

(*id.* at 371). Mr. Daniel testified he discussed with Petitioner, on more than one occasion, the pro and cons presenting battered woman's syndrome, and she agreed with his decision not to present it (*id.* at 372).

Following the testimony of Petitioner and Mr. Daniel, the parties discussed presenting the testimony of expert witness Dr. Honnecker. Counsel for Petitioner made the following proffer:

> Judge, if she was called, first of all, we would offer her as an expert witness in the field of Battered Woman's Syndrome and also in clinical psychology and offer her Curriculum Vitae which we've already put into evidence. I would proffer that she would testify that based on meeting with Ms. Rasley, interviewing her and looking over the police reports that she would testify that Ms. Rasley had shot her husband because she reasonably believed that he seriously was going to hurt or kill her or her children as he came back into the dwelling there. She will also testify there are several reasons why women with Battered Spouse Syndrome don't leave battering relationships. We believe that this expert testimony also would show that, it would rebut some of the myths associated with Battered Women's Syndrome as, for example, you know, why people don't leave battering relationships, do they perceive acts by the abusing spouse in a manner somewhat more threatening than a normal person that doesn't have Battered Spouse Syndrome. And that's what we would proffer that she would say.
>
> We believe that that's important because the fact, and if you look at the State's closing argument there was great emphasis placed by the State, and I'm looking at page 518 and 519 of the trial transcript, there was a great emphasis on the fact that Mr. Rasley came back in after Ms. Rasley had calmed the children down. Our position is had this expert been called this expert would have been able to place that in the proper context and shown that Ms. Rasley was quite clearly acting reasonable for somebody given her circumstances of having Battered Spouse Syndrome.

(Ex. Q at 375–76).  Petitioner's post-conviction counsel argued case law in this area (*id.* at 377–78).
The prosecutor in response argued as follows:

> Your Honor, without getting into the complete recitation of the facts that were presented at trial suffice it to say that Ms. Rasley's recollection differs substantially from the statement that she gave the police the night of the incident and her testimony at trial with regard to specific events.  She talks about Mr. Rasley attacking the children, well, the children didn't testify to that fact. She testifies as to the aerosol can.  Her testimony the night of was that she sprayed the aerosol can at him as he left the room.  So I think what we have is five plus years down the road a recitation of events to a counselor, to a doctor, to a profession that would be subject to cross examination in contrast to what Ms. Rasley has already testified to under oath and to the officers the night of the incident.

> I believe that Mr. Daniel did present to the jury the prior incidences [sic] of violence, domestic violence probably far beyond what he should have been allowed to do because of my handling of the case from the State's side, he was, in effect, able to argue Battered Spouse Syndrome, in effect, and I believe his closing argument would pretty much justify that statement without having to jump through the hoops and place Ms. Rasley in jeopardy of actually having a State expert interview her, depose her, if you will, for lack of a better term, and testify in opposition to her claim.

> I believe Mr. Daniel has done a good job of recalling his reasons for taking the tactical decisions that he did at trial, I believe that he gave good fair-based reasons for those decisions, that it was his testimony that he was able to elicit the issues and eliminate the issues that he wished to eliminate at trial and even though he does have some remorse as to whether or not he did a good job for Ms. Rasley, on Ms. Rasley's behalf, I do not believe it rises to the level that he was ineffective in the sense that but for his actions or lack of actions, as the case may be, that the outcome of the trial would have been different.

(Ex. Q at 379–81).

This record shows that the state court's factual findings, including the finding that Mr. Daniel made a tactical decision not to pursue battered woman syndrome as part of the defense, were reasonable.  Furthermore, the state court's adjudication of Petitioner's claim was not an unreasonable application of <u>Strickland</u>, because the record supports the conclusion that Mr. Daniel's decision was reasonable.  In his thirty-five (35) years of experience in criminal defense, including defending capital cases and numerous felonies, Mr. Daniel handled a number of cases involving women's self-

defense.[13]  Mr. Daniel discussed the prior acts of violence in detail with Petitioner and did not believe they supported battered woman's syndrome.  He was also aware of the police reports, at least one of which apparently characterized Petitioner as the aggressor; and he spoke with Ms. Sheryl Mills, who revealed that Petitioner stated she would kill her husband.  Mr. Daniel was aware of the pitfalls associated with presenting such a defense, including that it would expose Petitioner to an interview by an expert hired by the State.  Mr. Daniel discussed the use of battered woman's syndrome with Petitioner on more than one occasion, and she agreed with his decision not to pursue it.  Mr. Daniel additionally discussed the possibility of using battered woman's syndrome in Petitioner's case with another criminal defense practitioner, who agreed with Daniel's assessment. This evidence supports a conclusion that Mr. Daniel's decision not pursue battered woman's syndrome or present expert testimony on the subject was reasonable.  Moreover, Mr. Daniel exposed the jury to prior acts of violence by the victim toward Petitioner and her children through the testimony of Kristen Carlo and Petitioner's testimony.  Therefore, Petitioner has failed to show that the state court's adjudication of his claim was an unreasonable application of <u>Strickland</u>.

     E.    <u>Ground Ten: "Counsel was ineffective for failing to recall Ryan Rasely as a witness for the defense."</u>

Petitioner asserts the State called her nine-year-old son, Ryan Rasely, as a witness (Doc. 1 at 17).  She contends defense counsel was ineffective for failing to recall Ryan as a witness to testify to prior violent acts of the victim (Ryan's father) against Ryan and Petitioner, including, the victim hitting Ryan with a salad spoon with such force that the spoon broke, the victim dragging Ryan by his hair and shirt collar, the victim punching Ryan in the head with his fist, the victim chasing Ryan with a bat, the victim choking Ryan, and the victim kicking Ryan with his shoes on the night of the murder, leaving large red, black, and blue marks (*id.*).

Respondent concedes Petitioner exhausted this claim by raising it as Ground Thirteen in her Rule 3.850 (Doc. 34 at 77).  However, Respondent contends Petitioner is not entitled to federal

---

[13] Under Florida law, battered woman's syndrome is not a legal defense, but rather is used to explain the woman's experiences and state of mind to the jury.  In the context of self-defense, it is used to show that because of the prior conduct of the batterer, the woman reasonably believed that taking the batterer's life was a real necessity.  *See* <u>State v. Hickson</u>, 630 So. 2d 172 (Fla. 1993).

habeas relief because she failed to establish that the state court's adjudication of the claim was based upon an unreasonable determination of the facts or was contrary to or an unreasonable application of clearly established federal law (*id.* at 78–82).

> 1. Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

> 2. Federal Review of State Court Decision

In the state circuit court's written opinion denying Petitioner's claim, the court determined that Ryan Rasely's testimony regarding his father's prior violent acts toward him and Petitioner was irrelevant (Ex. R at 287). The court noted that vilification of the victim was not a recognized defense to murder (*id.*). The court further determined that the victim's nature was not relevant to self-defense or justifiable use of force; rather, the act that the defendant was resisting was relevant to the issue of whether the use of deadly force was justified (*id.*). Therefore, the state court concluded, Petitioner's counsel did not err in failing to recall Ryan Rasely to testify to prior violent acts of the victim (*id.*).

Petitioner submitted with her Rule 3.850 motion a copy of a summary of Ryan Rasely's progress during therapy sessions from November of 2001 to March of 2005, prepared by Mary Kay Young, a Licensed Mental Health Counselor (Ex. J at 203–14). At the post-conviction evidentiary hearing, Petitioner testified that if Ryan had been called as a defense witness, he would have testified that his father previously choked and strangled him and beat him with a baseball bat (Ex. Q at 327, 334). Petitioner read parts of Ms. Young's report during the evidentiary hearing, for example, the entry from a December 8, 2004 session:

> Following the tonsillectomy the child began to recover and started talking again about his dad on 12/8/04. He seemed more able to verbalize now with greater understanding and remembrance of the past. **"He was abusive. I tried to protect everyone and get him to hit me. He hit me when I was little. He was abusive when we moved to Panama City. That's when it started. It's ever since I could remember when I was four. My brother hid in the bathroom. It's a wonder he didn't tear down the door. He would hang me almost every day where I couldn't breathe. Maybe one day out of a week he wouldn't do it. Did I tell you the whole story of that night? Every night we would see her with a black eye or a swollen jaw. The first real bad fight the cop didn't take pictures. We weren't allowed to say anything. I tried to tell my story. I just wanted him to die**

**because he was so abusive. They would have given my mom less time if I could have told my story. The Rasleys don't know that he was abusive."**

(Ex. J at 214; Ex. Q at 335–36) (emphasis in original). Petitioner testified that another entry, dated February 9, 2005, stated::

> The 2-9-05 session was significant in that the client once again returned to harsh memories about his Dad. **"I got in the middle of stuff to protect them. I took all the beatings for it. I wouldn't stop and I said and I did things. I got choked, chased, poked. One time he hit me in my stomach with a bat. I wasn't happy he was gone but I was glad. My mom was the main target and I would try to stop him. I would do anything to save my mother. I thought either me or my mom would die. I would try to save her. I heard my mom say, 'Help me, help me.'"**

(Ex. J at 214; Ex. Q at 336) (emphasis added).

Petitioner failed to show that Mr. Daniel's failure to recall Ryan as a witness at trial was unreasonable, or that she was prejudiced by the alleged error. Petitioner admitted that at the time of trial, she did not believe that Ryan could distinguish the truth from a lie or separate fact from fantasy, due to his age and the trauma he experienced from witnessing his father's killing (Ex. Q at 326). She also admitted she did not believe that Ryan understood the significance of testifying at trial, or that he could understand or "properly answer" questions (*id.* at 325–26). Additionally, Ms. Young's report evidenced what Ryan may have testified to on December 8, 2004, not what he would have stated in August of 2002, when Petitioner's trial occurred. Indeed, the report itself suggests Ryan may not have been able to testify to the same information in August of 2002 that he revealed in December 8, 2004 — the December 8, 2004, entry stated that Ryan "seemed more able to verbalize now with greater understanding and remembrance of the past."

Further, although earlier entries in Ms. Young's report suggest Ryan may have testified that his father was physically abusive toward him, that his parents fought often, and that his father "beat up" his mother once,[14] the value of this testimony (if, indeed, Ryan would have revealed this on the stand) was questionable. This testimony did not suggest that the victim abused Petitioner to such

---

[14] On November 28, 2001, Ryan told Ms. Young that his father threw him against the wall and picked him up by the collar "all the time" (Ex. J at 206). Later that month, on December 15, 2001, he told Ms. Young that his father beat up his mother once, and "They fight a lot." (*id.*). In March of 2002, Ryan told her, "I wouldn't have been with my Dad if the police had come one more time . . . If they had come, Dad would have been arrested." (*id.* at 208).

a degree that there is a reasonable probability the trial would have resulted differently if the jury had heard it. Furthermore, it is evident from the trial transcript that Ryan was an unpredictable witness. His testimony contradicted some of his statements to police on the night of the shooting, and he testified that he remembered things differently at trial than he did on the night of the shooting (Ex. B at 227–37). Moreover, Ryan's testimony would have been cumulative of his sister Kristen's regarding Mr. Rasely's acts of violence toward Ryan and Petitioner. Ryan's unpredictability and the limited value of his testimony were such that Mr. Daniel's failure to recall him as a witness for the defense was not a decision that no competent counsel would have made. Therefore, Petitioner has failed to establish that the state court's adjudication of his claim was contrary to or an unreasonable application of Strickland.

     F.     Ground Fourteen: "The cumulative effect of counsel's errors deems the Petitioner's trial fundamentally unfair."

Petitioner contends the errors of trial counsel set forth *supra* had the cumulative effect of rendering the outcome of her trial unreliable and fundamentally unfair (Doc. 1 at 21).

Respondent concedes Petitioner exhausted this claim by raising it as Ground Nineteen in her Rule 3.850 motion (Doc. 34 at 85). However, Respondent contends Petitioner is not entitled to federal habeas relief because she failed to establish that the state court's adjudication of the claim was based upon an unreasonable determination of the facts or was contrary to or an unreasonable application of clearly established federal law (*id.* at 86–87).

The record shows that Petitioner raised this issue as Ground Nineteen in her Rule 3.850 motion (Ex. J at 194). The state circuit court did not expressly address this claim of cumulative error in its written order, but it expressly addressed each of Petitioner's claims of individual error and denied the Rule 3.850 motion (Exs. N, R). On appeal of the state circuit court's order, Petitioner argued that she was prejudiced by the court's failure to address her claim of cumulative effect (Ex. S at 44, 46). The First DCA affirmed the state circuit court's order without written opinion.

The Supreme Court has not recognized the cumulative error doctrine in the context of ineffective assistance of counsel claims.[15] Although the Eleventh Circuit has noted, on direct appeal of a federal conviction, that the cumulative effect of several errors that are harmless by themselves could so prejudice the defendant's right to a fair trial that a new trial may be necessary,[16] the Eleventh Circuit has never expressly recognized a freestanding "cumulative effect" claim, based upon the assertion that alleged errors of the trial court, defense counsel, or the State, or a combination thereof, rendered the trial fundamentally unfair even though such errors were individually harmless or non-prejudicial, as cognizable under § 2254. *See, e.g.,* Conklin v. Schofield, 366 F.3d 1191, 1210 (11th Cir. 2004) (applying pre-AEDPA standard of review and denying claim that trial court errors and conduct of trial counsel combined to rob petitioner of fair trial and sentencing, but not relying upon Supreme Court precedent for its decision); Sims v. Singletary, 155 F.3d 1297 (11th Cir. 1998) (applying pre-AEDPA standard of review and holding that district court erred in finding that cumulative guilt stage errors prejudiced petitioner during penalty phase); Cargill v. Turpin, 120 F.3d 1366, 1386 (11th Cir. 1997) (applying pre-AEDPA standard of review and declining petitioner's invitation to entertain "cumulative error" claim because petitioner's trial was not fundamentally unfair); Dobbs v. Kemp, 790 F.2d 1400, 1505 (11th Cir. 1986) (applying pre-AEDPA standard of review and denying petitioner's claim that improper prosecutorial argument and evidentiary errors rendered trial fundamentally unfair and citing

---

[15] The Eleventh Circuit recently noted "the absence of Supreme Court precedent applying cumulative error doctrine to claims of ineffective assistance of counsel." Forrest v. Fla. Dep't of Corr., 2009 WL 2568185, at *4 (11th Cir. Aug. 21, 2009) (unpublished). The court cautioned that the Supreme Court has held that "there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *Id.* at 5 (quoting United States v. Cronic, 466 U.S. 648, 659 n.26, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984)).

[16] *See* United States v. Ramirez, 426 F.3d 1344, 1353 (11th Cir. 2005) ("[T]he 'cumulative effect' of multiple errors may so prejudice a defendant's right to a fair trial that a new trial is required, even if the errors considered individually are non-reversible.") (quoting United States v. Thomas, 62 F.3d 1332, 1343 (11th Cir.1995)), United States v. Adams, 74 F.3d 1093, 1099–1100 (11th Cir. 1996) (citing United States v. Preciado-Cordobas, 981 F.2d 1206, 1215 n.8 (11th Cir. 1993)).

Donnelly v. DeChristoforo, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1973)); Bronstein v. Wainwright, 646 F.2d 1048, 1056 (5th Cir. 1981) (same).[17]

In any event, cumulative error analysis should evaluate only matters determined to be in error, not the cumulative effect of non-errors. *See* United States v. Barshov, 733 F.2d 842, 852 (11th Cir. 1984) ("Without harmful errors, there can be no cumulative effect compelling reversal."); Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir. 1987) ("Mullen cites no authority in support of his assertion, which, if adopted, would encourage habeas petitioners to multiply claims endlessly in the hope that, by advancing a sufficient number of claims, they could obtain relief even if none of these had any merit. We receive enough meritless habeas claims as it is; we decline to adopt a rule that would have the effect of soliciting more and has nothing else to recommend it. Twenty times zero equals zero."); *see also* United States v. Hall, 455 F.3d 508, 520 (5th Cir. 2006); Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (where there is no single constitutional error, nothing can accumulate to the level of a constitutional violation); United States v. Hardy, 224 F.3d 752, 757 (8th Cir. 2000); Angelone, *supra*; Moore v. Reynolds, 153 F.3d 1086, 1113 (10th Cir. 1998); United States v. Rivera, 900 F.2d 1462, 1471 (10th Cir. 1990) ("[A] cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors."); United States v. Conteh, 234 Fed. Appx. 374, 2007 WL 1229043 (6th Cir. 2007). Thus, Petitioner must show error with respect to at least two of his individual claims.

In the instant case, as previously discussed, none of the alleged errors of trial counsel that this court substantively reviewed, considered alone, approach the threshold standard of ineffective

---

[17] The law of the other circuit courts of appeals is mixed on the issue of whether a claim of "cumulative effect" or "cumulative error" is cognizable on federal habeas. The Fourth, Sixth and Eighth Circuits do not recognize cumulative error claims on federal habeas. *See* Williams v. Anderson, 460 F.3d 789, 816 (6th Cir. 2006) (claims of cumulative error are not cognizable on federal habeas because the Supreme Court has not spoken on this issue); Fisher v. Angelone, 163 F.3d 835, 852–53 (4th Cir. 1998) (ineffective assistance of counsel claims, like claims of trial court error, must be reviewed individually, rather than collectively); Wainwright v. Lockhart, 80 F.3d 1226, 1233 (8th Cir. 1996) ("Neither cumulative effect of trial errors nor cumulative effect of attorney errors are grounds for habeas relief."). The Ninth Circuit recognizes cumulative error claims and expressly recognized Chambers v. Mississippi, 410 U.S. 284 (1973) as the clearly established federal law governing such claims. *See* Parle v. Runnels, 505 F.3d 922, 928–29 (9th Cir. 2007). The Tenth Circuit recognizes cumulative error claims and recognized Brecht v. Abrahamson, 507 U.S. 619 (1993) as the clearly established federal law on this issue. *See* Darks v. Mullin, 327 F.3d 1001, 1018 (10th Cir. 2003). The Second and Seventh Circuits recognize cumulative effect analysis of individual claims of ineffective assistance of counsel in applying the prejudice prong of Strickland. *See* Williams v. Washington, 59 F.3d 673, 682–84 (7th Cir. 1995); Rodriguez v. Hoke, 928 F.2d 534 (2d Cir. 1991).

assistance of counsel. Taken together, their cumulative effect also falls far short of depriving Petitioner of effective assistance of counsel or rendering her trial fundamentally unfair. Furthermore, the remaining claims were procedurally barred. Therefore, Petitioner is not entitled to federal habeas relief on this "cumulative effect" claim. *See* <u>Bronstein v. Wainwright</u>, 646 F.2d 1048 (11th Cir. 1981) ("[A] state trial must be so 'fundamentally unfair' as to amount to a denial of due process before federal habeas relief can be appropriately applied.") (internal quotation and citation omitted)); *see also* <u>Walls v. McNeil</u>, No. 3:06cv237/MCR, 2009 WL 3187066, at **30–31 (N.D. Fla. Sept. 30, 2009) (unpublished) (same).

VI.    CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is **ORDERED**:

The clerk of court is directed to change the docket to reflect that Edwin G. Buss is substituted for Walter A. McNeil as Respondent.

And it is respectfully **RECOMMENDED**:

1.    That the petition for writ of habeas corpus (Doc. 1) be **DENIED**.

2.    That a certificate of appealability be **DENIED**.

Case No. 5:08cv368/RH/EMT

At Pensacola, Florida, this 11th day of April 2011.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).